UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Donald Renstrom, Jr.,

                Plaintiff,

    vs.                         REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

                Defendant.         Civ. No. 05-2716 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, <u>Title 42 U.S.C. §405(g)</u>, seeking a judicial review of the Commissioner's final decision which partially denied his application for Disability Insurance Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared by Jennifer G. Mrozik, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II.  Procedural History

The Plaintiff first applied for DIB on August 27, 2002, [T. 86], at which time,

he alleged that he had become disabled on September 17, 2000.  [T. 78].  The Plaintiff

subsequently amended his onset date of disability to July 20, 2001, as he

acknowledged that he had performed work activity at the substantial gainful level

from April 1, 2001, through July 20, 2001, that ended due to a general lay-off, and not

due to any severe medically determinable physical or mental impairments.  [T. 29, 67-

68].  The Plaintiff met the insured status requirement at the amended onset date of

disability, and remained insured for DIB through December 31, 2005.  [T. 87].

The State Agency denied these claims upon initial review, and upon

reconsideration.  [T. 39-48].  The Plaintiff made a timely request for a Hearing before

an Administrative Law Judge ("ALJ") and, on April 19, 2004, a Hearing was

conducted, at which time, the Plaintiff appeared pro se.  [T. 226-48].  Thereafter, on

August 11, 2004 , the ALJ issued a decision which denied the Plaintiff's claim for

benefits. [T. 29-34].  On January 17, 2005, the Plaintiff requested an Administrative

Review before the Appeals Council, [T. 9-10], which, on September 21, 2005, denied

the claim for review.  [T. 6-8].  Thus, the ALJ's determination became the final

decision of the Commissioner.  Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir.

2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108

F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

III.  Administrative Record

A.    Factual Background.  The Plaintiff was born on January 21, 1958,

making him 43 years old when he first alleged disability in July of 2001.  [T. 64].  He

has an eleventh grade education, and no high school diploma.  [T. 84].  The Plaintiff

last worked on July 20, 2001, as a pressman at Source, Inc.  [T. 24, 67, 79].  The

Plaintiff alleges that he cannot work due to a combination of a history of myocardial

infarction, chronic angina with some shortness of breath, and complications from a

shattered right heel.  [T. 30, 37, 44, 49, 78, 81, 90, 201].

In September of 2000, the Plaintiff fell out of a tree while trimming branches,

and fractured his right heel.  [T. 121, 125].  As a result, on September 26, 2000, he

underwent an open reduction and internal fixation of his heel, with multiple screws.

[T. 128, 133, 135-36].  The Plaintiff also had an x-ray taken of his spine at that time,

which revealed that his vertebra were normally aligned, with no fractures or

subluxations, although the lower of two (2) disc spaces appeared to be slightly

narrowed.  [T. 125].  The Plaintiff informed his treating physician that he had

previously had three (3) lumbar surgeries, with the last one having a "good result."

- 3 -

[T. 122].[1]  Since he was also noted to have an untreated history of hypertension for at least three (3) years, [T. 121-22], an electrocardiogram ("ECG") was taken, that indicated that the Plaintiff suffered from "borderline aortic root enlargement."  [T. 127, 134].  The Plaintiff also admitted that he had smoked two (2) to three (3) packs of cigarettes a day for approximately twenty-eight (28) years.  [T. 122, 189].

On December 12, 2001, the Plaintiff presented at the emergency room complaining of severe chest pain radiating down both elbows that was accompanied by shortness of breath.  [T. 137].  He reported that he had experienced several episodes of chest pain over the past several months, but that they had increased in intensity over the past two (2) weeks.  Id.  Diagnostic testing revealed that he had suffered from a myocardial infarction with severe coronary artery disease.  Id.  The Plaintiff had an urgent coronary bypass operation, and was discharged on December

---

[1]The Plaintiff did not submit any documentation for these back surgeries in the Record.

17, 2001, with instructions to quit smoking and take a daily aspirin, and he was provided prescriptions for Zyban,[2] Lopressor,[3] Zantac,[4] and Percocet.[5] [T. 138].

On December 24, 2001, the Plaintiff was sitting at home watching television when he had a sudden onset of burning chest discomfort similar to what he had experienced earlier that month. [T. 153, 155]. He returned to the emergency room, where he received intravenous nitroglycerin,[6] and Heparin,[7] that controlled his

---

[2]Zyban is a "non-nicotine aid to smoking cessation." Physicians' Desk Reference, at 1620 (60th Ed. 2006).

[3]Lopressor is a trademark for a preparation of metoprolol tartrate, that is "used in the treatment of hypertension, angina pectoris, and myocardial infarction." Dorland's Illustrated Medical Dictionary, at 1027, 1106 (29th Ed. 2000).

[4]Zantac is a trademark for a preparation of ranitidine hydrochloride, that is "used to inhibit gastric acid secretion in the treatment of gastric and duodenal ulcer, gastroesophageal reflux, and conditions that cause gastric hypersecretion." Dorland's Illustrated Medical Dictionary, at 1530, 1996 (29th Ed. 2000).

[5]Percocet "is indicated for the relief of moderate to moderately severe pain." Physicians' Desk Reference, at 1114 (60th Ed. 2006).

[6]Nitroglycerin is "used in medicine chiefly in the prophylaxis and treatment of angina pectoris." Dorland's Illustrated Medical Dictionary, at 1221 (29th Ed. 2000).

[7]Heparin is "used in the prophylaxis and treatment of disorders in which there is undesirable or excessive clotting, such as deep venous thrombosis, thromboembolism, and disseminated intravascular coagulation." Dorland's Illustrated Medical Dictionary, at 807 (29th Ed. 2000).

symptoms, and was admitted for observation. <u>Id.</u> The Plaintiff underwent a cardiac catheterization, and stents were inserted. [T. 154]. He was discharged with a prescription for Zocor[8] to control his elevated cholesterol. <u>Id.</u>

In February of 2002, the Plaintiff was seen in the Cardiac Rehabilitation Clinic, and was found to be limited by right foot pain, and chest soreness, after walking on the treadmill for six (6) minutes. [T. 190]. At his next evaluation, on April 24, 2002, the attending physician's notes indicate that the Plaintiff suffered from a "slow progression of chest pain and shortness of breath," and was "currently able only to walk." [T. 188]. Although he had quit smoking after his initial presentation in early December of 2001, he admitted that he had restarted three (3) days prior to his visit, and was taking nitroglycerin to manage his angina three (3) to four (4) times a day. [T. 189]. On April 25, 2002, the Plaintiff underwent a coronary angiogram and left ventriculogram with bypass graft angiography, as well as additional stenting of the second obtuse marginal artery with coronary artery intravascular brachytherapy. [T. 191-95]. Despite the procedure, one (1) vessel of the Plaintiff's heart remained completely blocked. [T. 194-95].

---

[8]Zocor is a trademark for a preparation of simvastatin, that is "used to lower blood lipid levels in hypercholesterolemia." <u>Dorland's Illustrated Medical Dictionary</u>, at 1646, 1997 (29th Ed. 2000).

In a follow-up post-bypass in late January of 2002, the Plaintiff reported no anginal symptoms and indicated that his shortness of breath was improving with exercise. [T. 208]. He still demonstrated elevated blood pressure at rest, and was told to continue taking his medications. Id. On April 18, 2002, the Plaintiff returned to his cardiologist and reported that he had been doing well since January of 2002, with only minor shortness of breath, and no need for nitroglycerin, but that over the past several weeks he had begun experiencing chest pain after walking. [T. 207]. He indicated that the situation was sufficiently serious that "something has to be done." Id. The Plaintiff was given a new prescription for nitroglycerin, and his doctor advised that he would arrange for the Plaintiff to have an angiography on a brachytherapy day. Id.

The Record reflects that, on May 31, 2002, the Plaintiff had no improvement in his chronic exertional angina, that required treatment with nitroglycerin on a weekly basis, and that he experienced "Class II, even Class III symptoms." [T. 206]. However, he reported no symptoms at rest. Id. The physician noted that the Plaintiff had experienced significant weight gain, and recommended nutritional counseling.

Id. He was given a prescription for Norvasc,[9] and told to follow-up in two (2) months.

Id. On October 10, 2002, an examination of the Plaintiff found that he continued to

be asymptomatic at rest, with intermittent chest pain leaving him with "good days and

bad days." [T. 205]. The Plaintiff was found to be slightly hypertensive, as he had not

been taking his blood pressure medications. Id. However, he had not experienced any

progress in his symptoms since April of 2002. Id. He was told to contact his

physician if any of his symptoms increased, and to arrange for an annual checkup. Id.

     B.    Hearing Testimony. The Hearing on April 19, 2004, commenced with

some opening remarks from the ALJ clarifying that the Plaintiff chose voluntarily to

go forward with the Hearing without representation, and explaining that "about half

the people go forward without a representative." [T. 228-29]. The ALJ then asked

the Plaintiff if he had any additional medical evidence to introduce into the Record,

and he confirmed that he did not. [T. 229]. The Plaintiff also did not have any

objections to any of the evidence introduced into the Record. [T. 230]. The ALJ

asked the Plaintiff if he had any medical evidence that post-dated the last treatment

documents in the Record, from Metropolitan Cardiology Consultants in October of

---

[9]Norvasc is a trademark for a preparation of amlodipine besylate, that is "used
in the treatment of hypertension and chronic stable and vasospastic angina."
Dorland's Illustrated Medical Dictionary, at 63, 1234 (29th Ed. 2000).

2002.  Id.  The Plaintiff testified that he had a stress test at the same facility two (2)

months prior to the Hearing date, but no other medical treatment or care.  Id.  The ALJ

then asked the Plaintiff to sign medical releases to allow Cardiology Consultants to

release records from November of 2002, until the present, and advised that she would

order those records.  Id.

      The ALJ then asked the Plaintiff to identify himself, and asked about his living

situation. [T. 231].  The Plaintiff explained that he lived alone.  Id.  He testified that

he had some high school education, but did not earn a GED, and had no additional

vocational training.  Id.  In response to the ALJ's inquiry, the Plaintiff testified that

he had been jailed once, in September of 1999, for a DUI.  [T. 231-32].

      Next, the ALJ asked the Plaintiff why he felt that he could not work a full time

job.  [T. 232].  The Plaintiff explained that he continued to have angina "pretty bad,"

and that the last time he had seen his physician, "they wanted to split me back open

because there is another vein that's still blocked."  Id.  He decided not to go through

with the open heart surgery at that time, because his doctors had informed him that

there was a chance that his veins would regenerate over time, or that part of his heart

would die, and then he would stop having chest pain.  Id.  The Plaintiff explained that,

although he had been told that his original heart operation was successful, he had to

return for stents four (4) months later, and his doctors told him then that they had missed one blocked channel during his first operation, with the only solution either to have surgery, or to wait and deal with the pain, in order to see if that part of his heart died off or regenerated.  <u>Id.</u>  He concluded by testifying that the angina was very painful, and came on unexpectedly.  [T. 233].  He expressed concern that, even at his former job, his employer might not let him sit down and "pop nitro" every time that an angina attack came on.  <u>Id.</u>

The ALJ asked the Plaintiff how often he used nitroglycerin, and he replied that he used it two (2) times a week.  <u>Id.</u>  He stated that this was partly because he did not have health insurance, and that was the reason why he had not seen a doctor recently.  <u>Id.</u>  Instead, he had learned that there were "plenty of times" when he could just "sit idle in * * * a chair for fifteen, twenty minutes" and wait for the pain to go away.  <u>Id.</u>  The Plaintiff concluded that, if he had to use nitroglycerin, then he would use it, but he tried to avoid it because of the expense.  <u>Id.</u>  The ALJ asked the Plaintiff if he took any other medications, and he responded that, in addition to the nitroglycerin, he took two (2) blood pressure medications,  as well as an aspirin daily. [T. 233-34].  He reported no side effects from his medications. [T. 234].  The Plaintiff added that he

also had nitroglycerin patches, that he used "off and on," usually on days, such as that of the Hearing, that he knew would be stressful.  Id.

The ALJ asked the Plaintiff if anything besides stress exacerbated his angina, and he testified that physical exertion made it worse, although he indicated that he had "good days and bad days."  Id.  He attested that some mornings he experienced angina on awakening, in which case, he would sit down and rest, and avoid eating, which also exacerbated the pain.  Id.  The Plaintiff admitted that he had gained fifty (50) pounds since the onset of his heart difficulties, which he attributed to his decreased physical activity.  Id.  In response to the ALJ's inquiry, the Plaintiff added that he did still exercise on a treadmill, and that, on some days, he walked as far as two (2) miles, but was not capable of doing that every day.  [T. 235].

According to the Plaintiff, he walked on his treadmill six (6) or seven (7) times a month.  Id.  The Plaintiff had no trouble sitting or standing, although he reported some discomfort sitting because of his three (3) back surgeries, and standing because of the "hardware" in his right foot.  Id.  The ALJ asked the Plaintiff about his back surgeries, and he explained that the last two (2) surgeries were in October of 1996, with the first surgery taking place two (2) or three (3) years before.  Id.  The ALJ asked the Plaintiff if his back still bothered him, and he replied that his back was still

sore, because he had degenerative disc disease.  [T. 235-36].  The Plaintiff noted that his physician had told him that he had the "back of a 60 year old guy," and that the goal of the treatment was to "patch it up and keep me out of a wheelchair."  [T. 236].

As related by the Plaintiff, after his last back surgery, his physician suggested that he should quit working, but he was unable to follow that advice because he had children at home.  Id.  At the time of the Hearing, the Plaintiff testified that his back bothered him on sitting, as it would become tight and achy.  Id.  However, he admitted that he "could probably sit for quite a while," but that all of his previous jobs had required him to stand for twelve (12) hours a day.  Id.  The ALJ asked if the Plaintiff could sit for four (4) hours, and the Plaintiff responded that he could, although he would be sore, and stiff.  Id.

The ALJ then asked the Plaintiff about his right heel fracture.  Id.  The Plaintiff stated that it only affected him when he was on his feet for a great deal of time.  [T. 237].  He added that, although he went back to work in July of 2001, he was laid off, and felt that he was not called back, as were others also laid off at that time, because he was "on the cane."  Id.  The Plaintiff explained that he uses a cane regularly, although less around the house and more often when he had to walk around town.  Id.

The ALJ then asked the Plaintiff about his activities of daily living.  [T. 238].
The Plaintiff testified that he drove a car, and that he had given up his former hobbies
of building things and hunting.  <u>Id.</u>  He also reporting reading, watching a lot of
television, and playing games on his computer.  <u>Id.</u>

Next, the ALJ asked the Plaintiff how much weight he could lift.  <u>Id.</u>  The
Plaintiff testified that, after his back surgery, his physicians told him to lift "no more
than a fork and a spoon," although, after his second back surgery they told him he
could lift up to ten (10) pounds.  <u>Id.</u>  However, he admitted that he lifted more weight
than that, at times when he felt good, and suggested that the angina bothered him more
while lifting than did his back.  <u>Id.</u>  The ALJ asked the Plaintiff if he could lift a
twenty (20) pound bag of potatoes without the angina bothering him, and the Plaintiff
felt that was able to do that, and had done that in the past.  <u>Id.</u>  He explained, however,
that he had been forced by the angina to stop two (2) times that morning as he walked
from the parking ramp to the Hearing.  [T. 239].

The ALJ then asked the Plaintiff what triggered stress for him.  <u>Id.</u>  The
Plaintiff replied that he found financial worries, related to being unemployed,
stressful, and that testifying at the Hearing was also stressful.  <u>Id.</u>  He also reported
stress from his two (2) daughters, both in their early twenties.  <u>Id.</u>  The ALJ asked if

the Plaintiff had any grandchildren, and he stated that he had one (1), that he saw every two (2) weeks.  Id.  The Plaintiff explained that he saw his parents frequently, because they lived in a near-by house, but that he did not see his friends very often, because he was not working.  Id.

The Medical Expert ("ME") then asked the Plaintiff a few questions.  Id.  First, he asked the Plaintiff if he had undergone a recent stress test.  Id.  The Plaintiff replied that he had, at Mercy Hospital, and that he had walked on a treadmill and afterwards had an ECG.  [T. 240].  According to the Plaintiff, his physician, Dr. Evans, told him, after the stress test, that he "looked pretty good."  Id.  The ME asked the Plaintiff if he smoked, and he admitted that had formerly been a smoker, and still smoked occasionally.  Id.  The ME explained that there was nothing in the Record about the Plaintiff's back surgeries, so he could not comment on them, but he noted that the Plaintiff had testified that he could lift.  Id.

In response to the ME's question about exercise, the Plaintiff testified that he walked approximately a mile on his treadmill, at a speed of "two-and-a-half," with a "three" incline.  [T. 241].  The ME asked the Plaintiff if he did any back exercises at home, and he advised that he did not exercise or stretch very often, although he admitted that, following his back surgery, he had been given exercises to perform at

home.  Id.  The ME had the Plaintiff confirm that he had undergone a bypass in December of 2001, and an angioplasty in April of 2002, and then the ME asked if he had undergone any heart catheterizations since the angioplasty.  Id.  The Plaintiff replied that he had not.  [T. 242].  The ME noted that the results of the ECG performed in October of 2002, were "okay."  Id.

Next, the ME asked the Plaintiff to describe his angina.  Id.  He explained that it felt like heartburn coming on, but stronger, and was accompanied by shortness of breath.  Id.  The Plaintiff stated that, when the angina was mild, he could just sit in a chair and relax, and it would go away.  Id.  The ME asked the Plaintiff to describe the pain, and he replied that it felt like the pain that had originally sent him to the hospital, when he first had a heart attack.  Id.  The Plaintiff testified that his angina was brought on by exertion, or stress, and sometimes appeared for no obvious reason, and to different degrees.  Id.

The ALJ next asked the Vocational Expert ("VE") if she had any questions for the Plaintiff, and she stated that she did not.  [T. 243].  The ALJ then resumed her questioning of the Plaintiff, and asked if he had looked for full time work at any time since July of 2001.  Id.  He replied that he had not.  Id.  The ALJ then examined the

experts, to determine their qualifications, and the Plaintiff indicated that he was satisfied.  [T. 243-44].

The ALJ asked the ME for his opinion as to the nature of the Plaintiff's impairment.  [T. 244]. The ME testified that the Plaintiff had a history of coronary artery disease, with a coronary artery bypass graft in December of 2001.  Id.  The ME noted that this only partially corrected the coronary obstruction, and consequently, the Plaintiff had to have an angioplasty with a stent implacement in April of 2002.  Id. The ME testified that, since that time, the Plaintiff had some symptoms suggesting angina with intermittent chest pain.  Id.  However, studies following the angioplasty, including the last one in October of 2002, found a normal ejection fraction, and normal echocardiogram.  Id.  Although there were no subsequent studies in the Record, the ME noted that the Plaintiff had reported that his recent stress test was also apparently normal.  Id.

The only other information that the ME could find came in October of 2002, from the Plaintiff's physician, who advised that his condition was stable.  Id.  The ME testified that there was no way to determine if the Plaintiff had actual demonstrable coronary insufficiency or true angina, or suffered from some other ailment.  Id.  The ME noted that, in October of 2002, the Plaintiff's physician had suggested a light

residual functional capacity ("RFC"), based on his findings. [T. 244-45]. In the absence of any other information, the ME concluded that the Plaintiff did not meet or equal a listing as of October of 2002. [T. 245]. The ALJ asked the ME what restrictions or limitations he would put on the Plaintiff in the work place, and the ME responded that he would recommend a light RFC, with a sit/stand option. Id. The ALJ then asked the Plaintiff if he was troubled by changes in the weather, and he stated that he was not. Id. In response to further inquiry, the Plaintiff testified that he was six (6) feet tall, and weighed three hundred (300) pounds, having last weighed two hundred and fifty (250) pounds in 2001. Id.

The ALJ then asked the VE if the testimony had changed her opinion, and she responded that it had not. Id. The ALJ then posed a hypothetical to the VE, asking her to assume an individual who was forty-two (42) years old, with an eleventh grade education. [T. 246]. The individual was taking a number of medications with no apparent side effects, was impaired with status post open heart surgery and stent implacement, and suffered from angina, high blood pressure, degenerative disc disease, and status post back surgery, times three. Id. The individual was limited to lifting and carrying twenty (20) pounds occasionally, and ten (10) pounds frequently, and could do work that required no heights, ladders, or scaffolding, or right foot pedal

- 17 -

manipulation, with only occasional bending, stooping, crouching, crawling, and twisting.  Id.  The individual would have to work in a low stress environment, where minimal industrial standards in production and pace were applicable.  Id.  The ALJ asked the VE if this hypothetical individual could perform the Plaintiff's previous relevant work.  Id.  The VE replied that he could not, because the work previously performed was too heavy.  Id.

The ALJ then asked the VE if there was any work in the regional or national economy for such a person, and the VE advised that there were positions, such as security guard or unarmed security, of which there were approximately 5,000 jobs that would be available to the hypothetical individual.  Id.  The VE also suggested that the individual could serve as a light machine operator, with between 8,000 and 10,000 positions available, or he could perform small product assembly, of which there were approximately 10,000 positions.  [T. 246-47].  The ALJ then asked if adding a sit/stand at will requirement would affect the number of positions available, and she indicated that it would.  [T. 247].  The VE testified that it would depend on how often the sit/stand shift would be invoked, but that there would still be 3,000 machine operating jobs available, and 3,000 small product assembly positions.  Id.  The VE affirmed that her testimony was consistent with the DOT.  Id.

The ALJ then asked the Plaintiff if he had any questions for the VE, or any comments for the Record.  Id.  In response, the Plaintiff stated that he felt that everything had been covered.  Id.  The ALJ then noted that she would ask the Plaintiff to sign medical releases before he left the Hearing, and that she would then order the remaining records and make her decision after reviewing those records.  Id.  The ALJ then closed the Hearing.  [T. 248].

C.   The ALJ's Decision.  The ALJ issued her decision on August 11, 2004. [T. 29-34].  As she was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520.[10]  As a threshold

---

[10]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

- 19 -

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 20, 2001. [T. 30].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity. Id. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by a right heel fracture and heart disease, including stable coronary artery disease, and chronic Class II exertional angina. Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, 20 C.F.R. §§404.1520(d). The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole. Id. She found that, after the initial internal fixation of the Plaintiff's right foot, he had no follow-up visits for that impairment.

---

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

Id. Although the Plaintiff testified that he used a cane when he returned to work from April of 2001, until July of 2001, and that he still used a cane outside of his home on occasion, the ALJ found that the Record contained no evidence that the fracture did not heal properly, or that it resulted in an impairment of the Plaintiff's gait. Id.

The ALJ also noted that the last medical records, which pertained to the Plaintiff's cardiac function, were from October of 2002, which was less than one (1) year after his coronary bypass, and revealed a diagnosis of stable coronary artery disease, with chronic Class II exertional angina, and no progressive or rest symptoms. Id. Reports from September of 2000, and December of 2001, reflected that the Plaintiff's left ventricular function was normal, and the Plaintiff had not undergone a coronary angiography since April of 2002. Id. The ALJ considered the Plaintiff's recent stress test, in February of 2004, and noted that, although she had requested medical records pertaining to this test, none were submitted. Id. She noted, however, that at the Hearing, the Plaintiff had testified that the test "went pretty good." Id. The ALJ found this evidence to be inconsistent with impairments of listing level severity. Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past

relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the impartial ME; the objective medical evidence; the State Agency consultants; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has had the residual functional capacity for work requiring lifting no more than twenty pounds occasionally and ten pounds frequently, no work around heights, ladders, or scaffolds, no right foot pedal manipulation, only occasional bending, stooping,

crouching, crawling, or twisting, and a sit/stand option at
will, in a low-stress environment, with minimal industrial
standards for production and pace.

[T. 33].

The ALJ concluded that such an RFC was consistent with the weight of the Record,

but was inconsistent with the Plaintiff's assertion that he had been disabled, by his

physical impairments, from all work activity since July 20, 2001.  Id.

In determining the Plaintiff's RFC, the ALJ first considered the testimony of

the Plaintiff, that he was unable to work due to recurrent angina, and some shortness

of breath, which sometimes required rest breaks of fifteen (15) to twenty (20) minutes,

and at other times required the use of nitroglycerin two (2) times per week, or the use

of a nitroglycerin patch.  [T. 30-31].  She noted that the Plaintiff testified that the

angina was brought on by exertion, stress, eating, or for no apparent cause, but that

he also testified that he was able to lift twenty (20) pounds without experiencing

angina. [T. 31].  The ALJ also considered the Plaintiff's complaints of back stiffness

and pain in his right foot, as well as his occasional use of a cane.  Id.

The ALJ found that the objective medical evidence, and the Plaintiff's course

of treatment, did not support more stringent limitations on the Plaintiff's RFC.  Id.

The Record disclosed that the Plaintiff sought no follow-up treatment for his fractured

- 23 -

right heel, after the initial internal fixation in September of 2000, and that, although the Plaintiff testified that he used a cane outside of his home, the Record contained no showing that he suffered any lower extremity motor defects or gait impairment.  Id. The Record likewise did not contain any medical evaluation or treatment pertaining to back pain.  Id.

The ALJ noted that the Records from September of 2000, revealed that the Plaintiff had uncontrolled hypertension, and that he was started on medication at that time, but there was no further evidence of a follow-up until he presented to the emergency room in December of 2001 with severe chest pain, and reported that he had not taken his blood pressure medication for the previous three (3) months.  Id.  The ALJ also considered evidence in the Record that the Plaintiff had a history of marked tobacco use, and smoked three (3) packs a day.  [T. 32].  After his coronary bypass surgery of December of 2001, the Record discloses that the Plaintiff underwent cardiac rehabilitation in January of 2002, and was exercising without cardiac symptoms, other than exertional shortness of breath, which was improving with exercise, although his blood pressure remained uncontrolled.  Id.

The ALJ noted that the Plaintiff complained of chest pain in April of 2002, and required nitroglycerin three (3) to four (4) times a day, and also that he had started to

- 24 -

smoke again.  Id.  The ALJ considered that, in May of 2002, the Plaintiff reported no improvement in his chronic exertional angina, with Class II and even Class III symptoms and, when he was seen in October of 2002, he was continuing to experience Class II symptoms, but no symptoms at rest.  Id.  The ALJ noted that the Plaintiff reported no side effects from his medication, and that, as of October 30, 2002, the Plaintiff's treating cardiologist opined that the Plaintiff would be able to perform light work, requiring lifting no more than twenty (20) pounds occasionally and ten (10) pounds frequently, standing/walking six (6) hours in an eight (8) hour workday, and sitting six (6) hours in an eight (8) hour workday.  Id.  The ALJ found that the ME agreed with this assessment at the Hearing, limiting the Plaintiff to light level work. Id.

The ALJ also considered the Plaintiff's daily activities.  Id.  She noted that the Plaintiff lived alone, and did not report requiring any assistance with personal hygiene and grooming activities, household chores, yard work, or shopping.  Id.  The ALJ considered the Plaintiff's testimony that he continued to drive, read, watch television, and play games on his computer, and that he visited with his parents, and saw his granddaughter every two (2) weeks.  Id.  The Plaintiff testified that he engaged in no exercise, other than walking a mile on a treadmill six (6) to seven (7) times a month,

and continued to smoke occasionally. Id. The ALJ further noted that the Plaintiff had

not sought counseling for stress related to his unemployment, and that his last

employment had ended in July of 2001, when the Plaintiff was laid off. Id. The ALJ

considered the Plaintiff's testimony, that he had not sought work since that time, and

found that the evidence was inconsistent with complete disability, and also with

motivation to return to work. [T. 33].

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's

analysis, that the Plaintiff would be unable to perform his past relevant work as a

printing press operator, because it was very heavy work. [T. 33].

Accordingly, the ALJ noted that the final step was to determine whether there

were other jobs, existing in significant numbers in the national economy, that the

Plaintiff could perform given his RFC, age, education, and work experience. Id. The

ALJ expressly noted that the burden of proof shifts, at this Step, to the Commissioner.

Id. The VE testified that the Plaintiff, as a younger individual, with an eleventh grade

and a history of skilled work, could find employment as a security guard, of which

there were 5,000 jobs available; a machine operator, with 3,000 jobs available; or a

small product assembler, with 3,000 jobs available. Id. The ALJ concluded that the

Plaintiff was capable of performing other jobs existing in significant numbers in the national economy.  Id.

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time since July 20, 2001.  [T. 34].

## IV.  Discussion

A.      Standard of Review.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).   This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).   Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143

F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82

- 28 -

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.    <u>Legal Analysis</u>. In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

1.    That The ALJ Failed To Properly Inform The Plaintiff Of His Rights As
      An Unrepresented Claimant;

2.    That The RFC Determined By The ALJ Was Incorrect; and

3.    That The ALJ Failed To Develop The Record After The Hearing.

See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 11</u>, at 4.

We address each contention below.

1.    <u>Whether the ALJ Failed to Inform the Plaintiff of His Rights as
      an Unrepresented Claimant</u>.

(a)    <u>Standard of Review</u>.   A claimant has a statutory right to

counsel at his Hearing.  See, <u>Title 42 U.S.C. §406(a)(1)</u>; <u>20 C.F.R. §404.1700</u>.  "The

absence of counsel, however, does not in itself deprive a claimant of a fair hearing."

<u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994), citing <u>Highfill v. Bowen</u>, 832

F.2d 112, 114 (8th Cir. 1987).   The claimant may waive the right to counsel "if

provided sufficient information to enable her to knowingly and intelligently choose

whether to retain counsel or proceed pro se."  <u>Filipi v. Shalala</u>, 1994 WL 706692 *2

(D. Minn., September 30, 1994)(citing cases); see also, <u>Rush v. Barnhart</u>, 432 F. Supp.

2d 969, 1003-04 (D.S.D. 2006).

In addition, "if the record contains substantial evidence showing that a claimant knowingly and willingly waived his or her right to legal counsel," there is no error in allowing the disability Hearing to proceed without counsel.  See, <u>Rush v. Barnhart</u>, supra at 1004, citing <u>Kraft v. Sullivan</u>, 1993 WL 151375 *2 (D.N.D., February 24, 1993).  Finally, while "[c]laimants, especially those not represented by counsel, can hardly be expected to be familiar with the intricacies of the Secretary's Guidelines," the ALJ is charged only with developing a reasonable record, and "is not required to function as the claimant's substitute counsel."  <u>Clark v. Shalala</u>, 28 F.3d 828, 830-31 (8th Cir. 1994), quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982); <u>Shepherd v. Chater</u>, 89 F.3d 841 *1 (8th Cir. 1996)(Table Decision).

       (b)    <u>Legal Analysis</u>.  The Plaintiff claims that he was not given an opportunity to waive his right to counsel both before, and again at the Hearing, and therefore, that he was improperly deprived of that right.   See, <u>Plaintiff's Memorandum</u>, supra at 47-48.  The Plaintiff suggests that this is a case of first impression in this District, but we note that our Court of Appeals directly addressed the issue in <u>Wingert v. Bowen</u>, 894 F.2d 296, 298 (8th Cir. 1990), and found that a claimant, who received a Notice from the Administrative Agency which delineated the process by which he could obtain representation at his Hearing, could waive that

right by a direct and intelligent response indicating his desire to forego an attorney. See also, <u>Huddle v. Barnhart</u>, 143 Fed. Appx. 721, 722 (8th Cir. 2005); <u>Shepherd v. Chater</u>, 89 F.3d 841 *1 (8th Cir. 1996)(Table Decision); <u>McKnight v. Shalala</u>, 51 F.3d 277 *1 (8th Cir. 1995)(Table Decision).

In <u>Filipi v. Shalala</u>, 1994 WL 706692 at *2 (D. Minn., September 30, 1994), the Court examined the holding in <u>Wingert</u>, and clarified that the case did not stand for the proposition that a claimant needed to take the affirmative step of writing to the ALJ to decline representation, but had merely proposed that as one basis on which a valid waiver could be found.  See, <u>Stroud v. Barnhart</u>, 2005 WL 679074 at *2 (D. Minn., March 22, 2005)(examining <u>Wingert</u>).   In <u>Filipi</u>, the Court found that a claimant had validly waived her rights when she was informed of her right to counsel on three (3) separate occasions, and ultimately declined representation at the start of her Administrative Hearing.  <u>Id.</u> at *3.  Here, we find that the Plaintiff was likewise given three separate opportunities to request counsel -- after receiving both pre-Hearing Notices, and at the Hearing -- and, by declining to exercise his right to counsel at the Hearing, the Plaintiff knowingly and intelligently waived that right.

The Plaintiff argues that "it is unclear" whether he received the pre-Hearing Notices, as the address listed on the Notices is different from his actual mailing

address.[11] The assertion is contradicted by the Plaintiff's responses to the ALJ's initial

questioning at the Hearing.  At the opening of the Hearing, the ALJ asked the Plaintiff

if he had contacted any of the representatives listed in the Notice, and he replied that

he had not.  [T. 228].  The ALJ asked him why, and the Plaintiff explained that he

thought that the Hearing would be like coming in to talk to "a counselor."  Id.  The

ALJ then said to the Plaintiff, "well, sir, you got a notice that was on your request for

a hearing back in April of '03," to which he replied "uh-huh."  [T. 229].  The ALJ

continued, explaining to the Plaintiff that the Notice "said you could get a rep," and

the Plaintiff affirmed, "right."  Id.  The ALJ then noted that the same information,

about the securing of a representative, was included in the Notice sent in June of 2003,

and the Plaintiff did not contradict that assertion.  Id.  Since the Plaintiff stated, on the

Record, that he had received the Notices containing information about representation

at the Hearings, and he had decided not to obtain representation, we do not accept his

belated suggestion that the Notice provided was inadequate or ineffective.

Next, the Plaintiff argues that, in order to knowingly and intelligently waive the

right to counsel at the Hearing, the ALJ needed first to instruct him that: (1) he could

---

[11]While his correct address is 3700 104th Trail North, Brooklyn Park,
Minnesota, the Notices were sent to 3700 105th Avenue North.  Plaintiff's
Memorandum, supra at 48; [T. 17, 26, 231].

postpone the Hearing without prejudice in order to obtain counsel; (2) the ALJ could not influence his judgment regarding the effectiveness of counsel at Hearings; and (3) the ALJ is obligated to answer any question about the Hearing procedure, and to inform him of his rights during the course of the proceedings. See, Plaintiff's Memorandum, supra at 49. We do not accept that that is the only valid procedure by which an ALJ can inform a claimant of his right to representation. In Rush v. Barnhart, supra at 983, 1004, an ALJ was found to have provided a fair warning to an unrepresented claimant when he explained to her that she had the right to obtain representation, that free counsel was available to qualified applicants, and that, while it was not mandatory that she be represented, the Hearing could be terminated, and continued, in order to allow her an opportunity to secure counsel.

At the beginning of the Plaintiff's Hearing, the ALJ similarly informed the Plaintiff of his rights:

> I'll explain your rights to you. You do have a right to a rep, you don't have to have one. A rep can ask questions on your behalf, make legal argument, review the exhibit file. Often they'll serve without any cost to you, unless you get an award. * * * However, about half the people go forward without a representative. And the questions I'd ask you today would be the same if you had a representative or not.

[T. 229].

Following the logic of <u>Rush v. Barnhart</u>, supra, we find that the advisory of rights, which the ALJ provided to the Plaintiff, were adequate to inform him of his right to representation.[12]   Accordingly, we decline to adopt the Plaintiff's suggested four-part "<u>Renstrom Instruction</u>" as a talismanic incantation for all Social Security Hearings, in which the claimant is unrepresented, as the law of this Circuit provides an adequate protection for such claimants.  See, <u>Plaintiff's Memorandum</u>, supra at 52-53.

Finally, the Plaintiff suggests that the ALJ erred by failing to inform him, after the conclusion of the ME's testimony, that he could pose questions to the ME.  <u>Id.</u> at 55.  However, at the end of the Hearing, the ALJ did ask the Plaintiff if there was "anything else you wanted to tell me * * *anything we missed or didn't cover," to which the Plaintiff replied, "I think I got it all, yeah."  [T. 247].  While the Plaintiff had a right to pose questions to the ME immediately after his testimony, the failure of the ALJ to stop the proceeding to ask the Plaintiff if he had any questions for the ME

---

[12]The Plaintiff further argues that the HALLEX, that contains the Agency's interpretation of its Regulations, see, <u>Howard v. Apfel</u>, 17 F. Supp. 2d 955, 971 n.15 (W.D. Mo. 1998), sets forth the appropriate procedure for informing a claimant of her rights at the onset of a Hearing, but the HALLEX manual is not binding on this Court. See, <u>Henrichs v. Barnhart</u>, 2004 WL 225053 at *21 n. 3 (N.D. Iowa, February 3, 2004).

was harmless, since it was subsequently corrected, and therefore, we find no reversible error on that score.

2.     Whether the RFC Determined by the ALJ Was Incorrect.

The Plaintiff argues that the RFC determination of the ALJ was incorrect, because the ALJ improperly assessed the Plaintiff's credibility, failed to properly consider the Plaintiff's disability at all times after the alleged onset date, and wrongly relied on VE testimony that was not substantial evidence.  Since the ALJ's evaluation of the Plaintiff's credibility impacts upon the weight he accorded to the VE's opinion, we address the credibility and onset date issue first.

a.     Whether the ALJ Improperly Assessed the Plaintiff's Credibility and Failed to Consider Disabilities Arising After the Alleged Onset Date.

(1)     Standard of Review.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, Driggins v. Bowen, 791 F.2d 121, 125 n.2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

- 36 -

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  See, Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Flaherty v. Halter, 182 F. Supp. 2d 824, 829 (D. Minn. 2001);  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.      the claimant's daily activities;

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication;

and

5.      functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)(listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider those factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury,

may vary from individual to individual.  See, Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.  See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  See, Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th

- 39 -

Cir. 1996); see also, <u>Lawrence v. Chater</u>, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ

may discredit complaints that are inconsistent with daily activities); <u>Clark v. Chater</u>,

75 F.3d 414, 417 (8th Cir. 1996); <u>Shannon v. Chater</u>, supra at 487.

Among the daily activities, which counterindicate disabling pain, are: a practice

of regularly cleaning one's house, <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir.

1997); <u>Chamberlain v. Shalala</u>, supra at 1494; cooking, <u>id.</u>; doing yard work, <u>Swope</u>

<u>v. Barnhart</u>, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, <u>Johnson v.</u>

<u>Chater</u>, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone,

do not disprove the existence of a disability, they are an important factor to consider

in the evaluation of subjective complaints of pain.  See, <u>Wilson v. Chater</u>, 76 F.3d

238, 241 (8th Cir. 1996).

(2)   <u>Legal Analysis</u>.  In arriving at her RFC, the ALJ

found significant inconsistencies between the Plaintiff's subjective complaints and the

Record as a whole.  Guided by <u>Polaski</u> and its progeny, the ALJ found the credibility

of the Plaintiff, as to the severity of his impairments, to be undermined by his medical

records, and by his course of treatment.

In discounting the Plaintiff's testimony, the ALJ referenced medical evidence

in the Record that related to the Plaintiff's complaints.  Specifically, the ALJ cited to

medical reports, which followed the Plaintiff's fracture of his right heel, and which

noted that, after the initial treatment, he sought no further medical consultation for that

alleged impairment.  [T. 31].  The ALJ also noted that the Plaintiff's claim, that he

used a cane outside of the home, was not documented, and that the medical record did

not demonstrate any lower extremity motor deficits, or gait impairment.  Id.  The ALJ

further considered the lack of any medical evaluation, or treatment, relating to the

Plaintiff's claimed back pain, and confirmed that this was inconsistent with a disabling

impairment, or a more restrictive RFC.  Id.  The ALJ also considered the Plaintiff's

claimed history of myocardial infarction, with coronary artery disease.  [T. 31-32].

The medical evidence disclosed that, in a follow-up to his bypass operation in January

of 2002, the Plaintiff was determined to be able to exercise without cardiac symptoms

other than shortness of breath, and even that symptom was improving with exercise.

[T. 32].

        The ALJ considered that, in April of 2002, the Plaintiff reported a one (1) to

two (2) month history of recurrent chest pain, which required the use of nitroglycerine

three (3) to four (4) times a day, but he also admitted that he had resumed smoking.

Id. The ALJ noted that, although the Plaintiff reported no improvement in his angina

in May of 2002, by October of 2002, he had no progressive symptoms, was

asymptomatic at rest, and his condition was deemed to be stable.  Id.  The ALJ considered the opinion of the Plaintiff's treating cardiologist, that the Plaintiff would be able to perform light work, requiring lifting no more than twenty (20) pounds, and standing six (6) hours in an eight (8) hour workday, as well as the fact that the opinion was shared by consulting physicians from the State Agency.  Id.  The ALJ also weighed the testimony of the ME at the Hearing, that the Plaintiff was limited to light level work.  Id.

Further, the ALJ found that the Plaintiff's daily activities were inconsistent with the degree of impairment that he was claiming.  In that respect, the ALJ relied upon testimony which reflected that the Plaintiff lived alone, and did not require any assistance with personal hygiene and grooming activities, household chores, yard work, or shopping, and that he retained the capacity to drive.  [T. 32].  The ALJ noted that the Plaintiff reported exercising only six (6) to seven (7) times per month, and smoking occasionally.  Id.  Finally, the ALJ considered the Plaintiff's reported activities of reading, watching television, playing computer games, and visiting with his parents and grandparents.  Id.  The ALJ also noted that the Plaintiff's testimony, that the results of his most recent stress test were good, and that he had not looked for any work since he was laid off.  Id.  The ALJ found this evidence was inconsistent

- 42 -

with a motivation to return to work, and demonstrated that the Plaintiff was able to function at a level that was accommodated by the ALJ's RFC. [T. 33]. As a consequence, we are not confronted, as the Plaintiff suggests, with the circumstance of a Record supporting the Plaintiff's assessment of his medical condition which, nonetheless, was rejected by the ALJ. To the contrary, the ALJ fulfilled her obligation to thoroughly parse the Record, and provide a reasoned explanation for her believability findings.

"We will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or incapacitation. Gonzales v. Barnhart, supra at 895, quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005), quoting, in turn, Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). We find no basis to reverse the Plaintiff's credibility rulings, and we reject that challenge to the ALJ's determination.

- 43 -

Nonetheless, the Plaintiff argues that, even if the ALJ did properly weigh his credibility, she erred by failing to consider whether he became disabled at any time after his original onset date of July 20, 2001. See, Plaintiff's Memorandum, supra at 57. Specifically, he suggests that the ALJ should have considered, in her analysis, the worsening of his angina after 2001.[13] However, as previously noted, we find that the ALJ thoroughly considered the evidence of Record, concerning the Plaintiff's angina, and we further find that substantial evidence, in the Record on the whole, supported her finding that the Plaintiff was not disabled, for a continuous twelve (12) month period, at any time since July 20, 2001. [T. 25]; see, Title 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c (a)(3)(A); White v. Barnhart, --- F. Supp. 2d ---, 2006 WL 3590055 at *1 (E.D. Mo., September 22, 2006); Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir.

---

[13]The Plaintiff also suggests that the ALJ should have considered the disabling effect of his alleged obesity, which arose after his onset date. See, Plaintiff's Memorandum, supra at 59. However, he did not claim obesity as a disabling factor in his application for DIB, or at the Hearing, and there is no evidence in the Record disclosing that he had ever been diagnosed as obese, or sought treatment for weight gain. The ALJ "has no obligation to investigate claims not presented at the time of the application for benefits and not offered at the hearing as a basis of disability." Sullins v. Shalala, 25 F.3d 601, 605 (8th Cir. 1994), cert. denied, 513 U.S. 1076 (1995); Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000); Baumann v. Apfel, 242 F.3d 373, 373 (8th Cir. 2000).

2006); Titus v. Sullivan, 4 F.3d 590, 594 (8th Cir. 1993)(claimant must demonstrate that disability, not impairment, lasted twelve months).

Specifically, the ALJ noted that, in a follow-up, post-bypass examination, in late January of 2002, the Plaintiff reported no anginal symptoms at all, and advised that his shortness of breath was improving with exercise. [T. 208]. The ALJ also examined the Plaintiff's cardiac history, and specifically considered his complaints of chronic exertional angina, ultimately determining that he had no symptoms at rest, in October of 2002. [T. 30]. Finally, the ALJ considered the Plaintiff's statement, at the Hearing, that he was able to lift twenty (20) pounds without experiencing angina. [T. 31]. Accordingly, the ALJ's determination, that the Plaintiff was not disabled by angina, for a continuous twelve (12) month period, between his alleged onset date and the Hearing, was supported by substantial evidence, and does not support a reversal and remand.

b.    Whether the ALJ Erred by Relying on the Testimony of the VE.

(1)    Standard of Review.   It is well-established that a hypothetical question must precisely set out all of the claimant's impairments that the ALJ accepts as supported by the Record. See, Hallam v. Barnhart, 2006 WL 3392179

- 45 -

at *2 (8th Cir., November 27, 2006)(ALJ must include in hypothetical those limitations that he finds consistent, credible, and supported by record as whole); <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006); <u>Goff v. Barnhart</u>, 421 F.3d 785, 794 (8th Cir. 2005). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." <u>Goff v. Barnhart</u>, supra at 794, quoting <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001), citing, in turn, <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1015 (8th Cir. 2000); see, <u>Grissom v. Barnhart</u>, 416 F.3d 834, 837 (8th Cir. 2005). "A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." <u>Harwood v. Apfel</u>, 186 F.3d 1039, 1044 (8th Cir. 1999), citing <u>Hutton v. Apfel</u>, 175 F.3d 651, 656 (8th Cir.1999). The hypothetical does not need to include medical terminology from the Record, but should capture the "concrete consequences" of the supported impairments. <u>Lacroix v. Barnhart</u>, supra at 889, citing <u>Roe v. Chater</u>, 92 F.3d 672, 676-77 (8th Cir. 1996); see, <u>Gill v. Barnhart</u>, 2004 WL 1562872 at *7 (D. Neb., July 13, 2004); <u>Hunt v. Massanari</u>, supra at 625.

      (2)    <u>Legal Analysis</u>. The Plaintiff alleges that the ALJ should not have relied on the VE's testimony, because the testimony was based on a flawed hypothetical that failed to capture the "concrete consequences" of the Plaintiff's

- 46 -

alleged disabilities.   See, <u>Plaintiff's Memorandum</u>, supra at 64.   Specifically, the Plaintiff alleges that the ALJ failed to include, in her hypothetical to the VE, evidence that the Plaintiff had "good days," during which he was capable of exercising, and "bad days," during which he suffered from unpredictable chest pain, and that he could not predict when a good day would devolve to a bad day.  <u>Id.</u> at 65.

As we have related, the ALJ determined that the Plaintiff experienced angina that was precipitated by exertion, stress, eating, and for no apparent reason, but noted that he reported being able to lift twenty (20) pounds, without experiencing any anginal pain.  [T. 31].   The ALJ found that, in October of 2002, the medical records reflected that the Plaintiff was experiencing no anginal symptoms at rest, and that his chest pain was only intermittent.  [T. 32].   Further, the Plaintiff's treating physician, and consulting medical experts, concluded that the Plaintiff was capable of performing light work, with a sit/stand option, and could lift no more than twenty (20) pounds occasionally, and ten (10) pounds frequently.  <u>Id.</u>  Although she did not specifically posit that the hypothetical individual's physical condition could vary from day to day, in her hypothetical to the VE, the ALJ specified that the individual suffered from angina, and therefore, should be subject to a low stress work environment, where minimal industrial standards in production and pace were applicable.  [T. 246].

The ALJ also included a sit/stand option in the Plaintiff's RFC, so as to accommodate his testimony that sitting down, when he felt anginal pain, could help it resolve without the use of nitroglycerine.   [T. 33].   The VE confirmed that she considered the limitations, which were set out in the ALJ's hypothetical, and that jobs were available in the regional economy that satisfied those exertional limitations.   [T. 247].   Therefore, the assumptions posited by the ALJ, in her hypothetical to the VE, included those elements of the Plaintiff's impairments that she found consistent with the Record as a whole and, in this respect, we find no reversible error.

> 3.   Whether the ALJ Failed To Develop The Record
> After the Hearing.

(a)   Standard of Review.   "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."   Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); see, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).   The ALJ's duty to develop the facts fully and fairly is enhanced when the Plaintiff is not represented by counsel.   See, Mitchell v. Shalala, supra at 714, citing Highfill v. Bowen, supra at 115.   However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical

evidence to determine whether the claimant is disabled," <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1023 (8th Cir. 1994), or if a critical issue would otherwise be left undeveloped. See, <u>Ellis v. Barnhart</u>, supra at 994.

"'[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1051 (8th Cir. 1999), quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189 (8th Cir. 1994). Further, it is well-established that "[a]n ALJ ordinarily has no obligation to investigate claims not presented at the time of the application for benefits and not offered at the hearing as a basis of disability." <u>Sullins v. Shalala</u>, 25 F.3d 601, 605 (8th Cir. 1994), cert. denied, 513 U.S. 1076 (1995); <u>Kitts v. Apfel</u>, 204 F.3d 785, 786 (8th Cir. 2000); <u>Baumann v. Apfel</u>, 242 F.3d 373, 373 (8th Cir. 2000).

(b)   <u>Legal Analysis</u>. The Plaintiff contends that the ALJ erred in failing to order the Plaintiff's medical records, from November of 2002, until the present, despite having advised, at the Hearing, that she would do so, and in not ordering any medical records concerning his prior back surgeries. See, <u>Plaintiff's Memorandum</u>, supra at 26.

The Regulations require that, prior to a determination that a claimant is not disabled, the State Agency will develop the claimant's medical history for at least the twelve (12) month period preceding the month in which the claimant's application was filed, and will "make every reasonable effort" to assist the claimant in obtaining his medical reports from his own sources. See, 20 C.F.R. 404.1512(d).[14]   The Regulations do not require an ALJ to order records dating from after the filing of the claim for DIB, unless he finds that the Record is otherwise incomplete. See, e.g., Warburton v. Apfel, supra at 1051. Here, the Plaintiff filed his application in August of 2002. [T. 29]. At the Hearing, the ALJ asked the Plaintiff if he had received any additional medical treatments, since the date of his application, and the Plaintiff responded that he had undergone a stress test "a couple of months back." [T. 230]. The ALJ disclosed her interest in "mak[ing] sure we get everything," including the records from the stress test, and she asked the Plaintiff to sign releases so that she could gain access to that information. [T. 230, 247]. In her decision, the ALJ noted

---

[14]20 C.F.R. 404.1512(d)(1) clarifies that "every reasonable effort" means "that [the State Agency] will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [the State Agency] will make one followup request to obtain the medical evidence necessary to make a determination." 20 C.F.R. §404.1512(d)(1).

- 50 -

that she had requested those records, but that they had not been submitted to her.  [T. 30].

The comments of the ALJ at the Hearing disclose that she did not request the stress test records because she felt that the Record was incomplete, but because she wanted to assure that the Plaintiff was able to have the entirety of his relevant medical history considered.  In her decision, the ALJ cited the rest of the available evidence, including the testimony of the ME, the reports of the consulting physicians, and the Plaintiff's own testimony, that he was told by the physicians monitoring his stress test that he "looked pretty good."  Id.  The Plaintiff has not demonstrated that any material records are missing from the twelve (12) month period leading up to the filing of his claim, nor has he, or his counsel, submitted any medical records, or other documentary evidence, to the ALJ.  As a consequence, we conclude that the ALJ fulfilled her responsibility to employ reasonable efforts to obtain the results of the Plaintiff's stress test and, more importantly, that substantial evidence was presented, without the stress test results, to allow the ALJ to responsibly determine the Plaintiff's RFC.

The Plaintiff further challenges the sufficiency of the Record, by contending that the ALJ erred in relying upon a telephonic opinion by his treating physician, Dr. Evans, to a State Agency physician, that represented that the Plaintiff could perform

light duty work, without obtaining written confirmation of the opinion expressed. See, Plaintiff's Memorandum, supra at 44. The Regulations provide that, if the ALJ contacts a medical source in order to clarify an ambiguity, or to fill a gap in the Record, and if that additional medical evidence is supplied by telephone, then "the telephone report will be sent to the source for review, signature, and return." See, 20 C.F.R. §404.1512(e)(1).

The Record reveals that on November 25, 2002, and November 28, 2002, Dr. Norton Rogin, from the State Agency, unsuccessfully attempted to contact Dr. Evans for the updated cardiological records on the Plaintiff. [T. 204]. On November 30, 2002, Dr. Rogin spoke with Dr. Evans by phone, and noted that Dr. Evans had advised that, at the Plaintiff's last visit in October of 2002, he had been experiencing angina with moderate activity. Id. According to Dr. Rogin's notes, which were included in the Record, Dr. Evans had recommended that the Plaintiff ought to be able to perform light duty work, with no contraindication to lifting a maximum of twenty (20) pounds, and being on his feet for six (6) out of eight (8) hours of the day. Id. No written corroboration of that opinion was signed by Dr. Evans and, in reaching her determination, that the Plaintiff retained an RFC for light work, the ALJ considered Dr. Evans' telephonic opinion. [T. 32].

However, the ALJ also relied on the opinions of the consulting physicians, and the Hearing testimony of the ME, as well as the testimony of the Plaintiff himself.  [T. 32].   As a result, we find no reversible error in the ALJ's reliance on Dr. Evans' telephonic opinion, in determining the Plaintiff's RFC, as she did not give his opinion controlling weight, but evaluated that evidence in light of other medical evidence on the Record as a whole, which supported her assessment of the Plaintiff's RFC.

Finally, the Plaintiff argues that the ALJ erred in failing to order medical records which related to his history of back pain.  The Regulations require the ALJ to consider only impairments claimed by the claimant, or about which the claimant has submitted evidence.  See, 20 C.F.R. §404.1512(a).  Throughout his application, and at the Hearing, the Plaintiff only alleged that he was disabled by his cardiac history, including angina, and his right heel fracture.  At the Hearing, the ALJ inquired about evidence in the medical record which documented that the Plaintiff had previously undergone surgery on his back, and the Plaintiff testified that the only difficulty he had with his back was that it would become stiff with sitting.  [T. 235-36].  Despite that testimony, in response to the ALJ's questioning, the Plaintiff acknowledged that he was capable of sitting for four (4) hours at a time.  Id.  The Plaintiff introduced no other evidence to indicate that he had complained about, or had sought treatment for

back pain, since the alleged onset date of his disability.  We find that, as the Plaintiff did not allege that he was disabled by back pain, the ALJ did not err by failing to order medical records that might have contained information on the Plaintiff's previous back surgeries.[15]

In sum, finding no error in the Record before us that would warrant a reversal, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Cross-Motion be denied.

NOW, THEREFORE, It is –

_____

[15]For the same reason, we reject the Plaintiff's contention that the ALJ should have ordered a psychological assessment, in order to develop evidence of a possible mental impairment, since there is nothing in the Record to suggest that the Plaintiff suffered from any mental disability.  Cf., Gasaway v. Apfel, 187 F.3d 840, 843 (8th Cir. 1999)(allowing reconsideration despite failure to plead mental disability when plentiful evidence in Record indicated history of mental illness); Thompson v. Sullivan, 878 F.2d 1108, 1110-11 (8th Cir. 1989)(ALJ failed to consider possible mental impairment despite evidence on record); Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)(ordering psychological evaluation when plaintiff testified to anxiety but lacked medical records).

RECOMMENDED:

1.     That the Defendant's Motion [Docket No. 14] for Summary Judgment be granted.

2.     That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.


Dated:  December 29, 2006              *s/Raymond L. Erickson*
                                       Raymond L. Erickson
                                       CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **January 16, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **January 16, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.